All rise. Good morning. Good morning. Good morning. Okay, the last case on this morning's docket is 516-0186, Craig Sykes v. Granite City Fire Pension Board of Trustees. Mr. Patty? Everything is reversed. And you are Mr. Craven? Yes, ma'am. Okay, Mr. Craven, you may proceed. Thank you. And I'm glad to note that I'm here on Be Nice to Springfield Warriors Day. We all remember. As I said, we don't know where Springfield is. Now, you represent? The Fire Pension Board. Okay, great. Okay, you may proceed whenever you're ready. Thank you. The question before the board and the decision of the board to be reviewed by this court was whether Mr. Sykes carried his burden of proof to establish that his disability is related to an active duty or the cumulative effects of an active duty. All the doctors found him to be disabled. The board found him to be disabled. But the board found he did not carry his burden relating to the cause of that disability. On administrative review, and I understand fully that I'm preaching to the choir, that the question is whether the evidence in the record supports the board's decision that the trial court or this court may disagree with the board or even that the opposite conclusion is or could have been reasonable is not the issue on appeal. If the record contains sufficient competent evidence to support the board's decision, that decision should be affirmed. So what's the evidence in this case? In March of 2007, Mr. Sykes was on the fire department. He was at the firehouse. And while simply getting out of bed, no alarm, no emergency, just getting out of bed, he heard a popping sound in his back. In July of that year, he had a spinal fusion resulting from this non-duty injury and was off work until December of 2007. In the summer of 2014, he developed back pain. And again, fire department records are devoid of any evidence of a work-related claim. Now, when you say work, you mean putting out a fire. You don't mean work that you're on duty. That's the question. Or when are you working? When you're on duty or when you're putting a fire out? When you are working, a duty-related disability arises from injuries and you are fulfilling either the general or the special orders of the fire department. That's not the answer. I mean, I don't think that's what he's looking for. So you're at the firehouse. You're getting paid by the hour, I guess. Is that what it is? When you're at the firehouse? It's a contract called an annual salary. Okay, because we've got volunteers down here, you know, a lot of places. But he's a full-time fireman. He's a full-time fireman. Okay, so when he's at the firehouse, he's working. When he's at the firehouse, he's working. If you get injured getting up and down out of a chair, if you get injured getting in and out of bed, that's not a duty-related injury. Or if he falls down the steps at the firehouse, he's not working. Depending on what he's doing. If he's simply walking up and down the stairs, that's not working. If he's washing the fire truck, is he working? Yes. And if somebody has him move a box and he hurts his back, is he working? He's working. As long as it's an order from up above? Right. But simply standing there, simply walking across the living room floor of the firehouse, you're not working. And what about the old law school theory that you take an individual as you find him or her? I mean, we know this gentleman had a long history of back problems. You didn't learn that one in law school? I didn't know Mrs. Paltrow. Mr. or Mrs. is here. But isn't that true? I mean, you take the plaintiff as you find him when he's coming back to work? I mean, you're talking about his back, his prior back history. We know about that. Right. We've all read the brief. Right? There were prior back injuries in, I believe, 04, 06 that were related to work. 07 was not related to work. Does it matter, though, what the prior back injuries were? In other words, all this 207, 202 or whatever, at the time he's actually hurt for the injury he's claiming a pension for, do you agree that he was working when he was injured? On February 6, 2015, yes, he was working. Okay. So that's a fact we can all agree on. Yes. So my question was, on February 6, 2015, if he had all these back issues, whether they were related or not related to being on duty working, does that really matter? The language of the statute is that it has to be for a duty-related pension. It has to be an injury in an act of duty or the cumulative effects of injuries from acts of duty. So are we to pick one out, and the other one stays? You know what I'm saying? If he had a back injury in, say, 206, for example, and wasn't working and had an injury in 207, isn't it like Dr. Gornat testified to, that this was a cumulative effect? He was injured in 04 and he returned to work. He was injured in 06 and returned to work. Were those work-related injuries? Yes. Okay. In 07, it was a non-work-related injury. He had surgery. He was off work for six to eight months, and he came back. So 2007 was non-work-related? Yes. Okay. But the same part of his back, right? Yes. And just to make my question clear, the same portion of his back in 2007 was the same in 2004 and 2006, which were work-related? Yes. Okay. Then he had surgery in 07, and he again began to complain of back pain in the summer of 14. There's no evidence in the fire department records of any work-related injury claims in that time frame. Which time frame, sir? The summer of 14. How about between 07 and 14? No. No testimony of any work? No. And it looks like he was off work from September 2014 until February 2015. Right. Why was that? With a diagnosis. Back pain. Okay. With a diagnosis in October of 2014 of degenerative disc disease. Okay. So the kidney thing was a non-starter. Kidney stone issue. You thought he had kidney stones? Yes. That was his testimony. But October 2014 to when, sir? He was off work until February 2nd or 3rd of 2015. Okay. And those were complaints of back pain? Yes. That he said he couldn't work? Right. Okay. Did the board send him to a doctor, the department sent him to a doctor at that time, between 2014 and 2015? He was being treated at that point by a chiropractor, Dr. Evenson. Which one? Evenson. Or Evanson, depending on. So I go back to my question then. You've got a guy with a long history of back issues, all probably in about the same spot. Do we take a plaintiff as we find him under the circumstances on February 6th, 2015? Well, there's an issue of whether he should have been there on February 6th, 2015. Okay. But in order for the duty, it's not a negligence case. It's a duty disability case under the statute, which requires either a duty-related injury or the cumulative effects of acts of duty. So the reason I keep asking the question is because of the word injury. Duty-related injury. So that's where I'm at. I keep asking. Maybe I'm missing something. The board's finding is that his back problem is the result of lumbar degenerative disease, which was diagnosed in October of 2014. He was released to work by his chiropractor and returned to work for one day. That would have been the 5th? February 6th. He was hurt on the 6th. 6th, right. It says his first day back to work. And that was his first day back to work. I think the release from the chiropractor is, I think, the date of the 2nd or the 3rd. Okay. Was he restored to full active duty? According to the note from the chiropractor on February 2nd, he was restored to work without limitation. Okay. Leaving open the question, why would he do that when on January 26th, in his notes, Dr. Edenson noted that Sykes' back pain is aggravated by all movements, especially left lateral bending. But somewhere between January 26th and February 2nd, he was released to work with no restrictions. But, you know, do we know whether he had, like, injections or something that happened between those few days? Nothing in the records that I recall would reflect that. Okay. Are the medical records in the records? Yes. I'm sure the justice is assigned to that. Looking very forward to it. The three doctors, three of the doctors that examined him before the statute, the board had him examined by three doctors. Dr. Malico finds that it's his opinion that Mr. Sykes was not ready to return to full duty on February 6th. Dr. Tibby stated that Mr. Sykes' conclusion that he was fully functional before returning to work on February 6th is not supported by the medical record. Dr. Homan stated as far as there being any due work injury on this one day return to work, I think would be a far stretch of anyone's imagination. He was not fit to return to work. The injury, his disability is the, in the board's conclusion, was the degenerative disc disease. That's supported by the pre-February MRI compared with the MRI after the February 6th. There's no change from September 14th in the MRI to the post MRI, the post February 6th incident. Dr. Cornett, I think it's fair to say that the board discounted his conclusion because Dr. Cornett in his statement says that prior to February 6th, 2015, he, Mr. Sykes, was working full time with no restrictions. That's simply not in the records. That's simply not factual. Prior to February 6th, 2015, he'd been off work since September or October of 2014. So you think that the court discounted Dr. Cornett's testimony completely because of the inaccuracy of the dates? I think the board did. I'm sorry, the board. Yes. Apologize. Okay. Do you think Mr. Sykes is eligible for any pension? Yes. Having been a firefighter? Yes, and the board awarded him a non-duty disability pension. And what's the difference? Is it 50% versus 100%? A duty-related disability is 65% of salary attached to rank. A non-duty disability is 50%. So it's 65% versus 50%. Right. And there's also a difference in the tax treatment, the duty-related tax treatment. Duty-related disability is treated as a worker's... Like tax rate. Yes. Except for any interest earned. Right. And the non-duty disability is taxed. Is taxed. In sum, your honors, the board determined that yes, Mr. Sykes is disabled, but based on the 2007 and 2014 non-duty incidences and the... determination in October of 2014 that he suffered from degenerative disc disease, the board made a determination based on the evidence as it's laid out in our brief, Mr. Craven, let me ask you a question. I'm looking at a case called Barber, B-A-R-B-E-R, versus Board of Trustees of the Village of South Farrington Police Pension Fund. And in this case it says that there is no requirement that the duty-related incident be the originating or primary cause of the injury, although a sufficient nexus between the injury and the performance of the duty must exist. So that's why I keep asking you about the priors. I don't think the law is sophisticated enough to allow us to pick this injury, this one's duty-related. But I think that at least this case says as long as the injury is the approximate cause, if you will, or they say a sufficient nexus to being on duty, then you take the plaintiff as you find them. I know that sounds like negligence, but that's what I meant. I meant this case, if you're familiar with it. In this case, the disability is caused by the degenerative disc disease. An aggravation of it. Well, the judges, I'm sorry, the doctors, say that it was at best a minor aggravation. But still an aggravation. But still an aggravation. But they also, the doctors. I mean, you do have three doctors who are saying it's an aggravation. But they're also saying that the conclusion that he was fully functional and should have been returned to work was an error. Well, you've got the one error. And, of course, that goes, I assume, to the weight of the credibility, weight, testimony. Clearly, the judge, the trial court judge, looked at the same evidence and disagreed. He doesn't move all due respect to the trial court judge. Yes. The trial court judge isn't there to re-weigh the error. Right. The trial court is there to determine if there is sufficient evidence in the record to support the determination of the warrant. And there is sufficient evidence in those statements from the doctors that he was not fully functional and should have been there in the first place. And it's degenerative history. I think the order, the trial court order, in a couple of specific spots, very clearly. What are you looking at? I'm not looking at the error. Finding number five. What page are you on, sir? A form. Appendix one. Yes. Okay. The petitioner's testimony before the court was unproper, but it is inherently truthful. It's not a determination the court can make. The court finds it instructive that all three of the respondents' doctors agree the petitioner was disabled. Interesting, but not to the point of the cause of the disability. And he reviewed it. Well, but in number one, he talks about the accumulated effect. Again, aggravation we're talking about. Right. So he does note that in paragraph one. All of which were work-related, which is simply not factual. O7 was not work-related. I guess it's not O14. O14 was not work-related. Okay. The petitioner incurred injuries in the line of duty, which caused him to be permanently disabled. I'm assuming. Will you tell me what that means? Why isn't that true? Well, according to page three of my reply brief, Dr. Holman states that as far as there being any new work injury on this one day of return to work, I think would be a far stretch of anyone's imagination.  You'll have a chance for rebuttal, sir. Thank you very much. What page was that on, three? Yeah, three. Thank you. Is it Mr. Patty? Is that how you pronounce it? Patty is how you pronounce my last name. Sorry? Patty is the correct pronunciation for my last name. Okay, you're going to have to speak way up. I'll make sure to speak up. Very tall ceilings. I understand. Yeah, my first name is the one that you may need some help with pronouncing. Patty, please. Very good. Good morning, Your Honor. I represent Mr. Craig Sykes. Essentially, a lot of interesting points were brought up on moral arguments by opposing counsel. I want to focus on a few of them. First, the difference in the standard of review here. Counsel states that confident evidence exists. Therefore, the decision of the board should remain unchanged. However, the standard of review, as we know, is that this might be evidence. And it's not that an opposite conclusion is reasonable. It's not that an opposite conclusion is flawed. The standard states that an opposite conclusion must be clearly apparent. Now, in order to determine what ought to be in this case, we must first determine what is. What we know is Mr. Sykes was injured in 2003, 2006, 2007, 2014, respectively, until he was ultimately injured in 2015 when he returned to work. Now, the circumstances surrounding the case understandably will raise an eyebrow. However, here's what we know. Here's what is reflected in the record. Mr. Sykes was off work for an extended period of time. He was treated by a chiropractor and physical therapist during that time. But he was also seen by Dr. Warnell. The decision of whether or not he should or should not have been at MMI is not one that we look at in hindsight to determine whether or not that was the right call. At the time, based on the evidence that the doctors had, it was the right call. Now, you mentioned an interesting point regarding does the fire department or does an employer take the employee as he or she finds them? The answer is yes. Mr. Patti, I'm going to interrupt you, and I'm going to ask you to hold the time. We need to take a quick recess. Just come and be right back. I don't think he was. I don't know. I was only 90% sure. He was seen by Dr. Warnell. I don't know. I stand corrected. I don't know that I have. It was Dr. Kennedy and not Dr. Warnell. I guess that's the world. I don't know. I don't know. All right. I apologize for the inconvenience. You may sit down. To the extent that I inconvenienced you, Mr. Patti, if you need more time to start over and get your thoughts back, I'm more than willing to give you the time. So just let her rip, so to speak. No problem, Your Honor. Allow me a moment for you to clarify, however. When I stated that prior to returning to work, prior to being declared at maximum medical improvement, Mr. Sykes was seen by Dr. Gornet and Dr. Evanson, Dr. Evanson being his chiropractor who oversaw his physical therapy. Prior to returning to work, prior to being placed at MMI, the misstatement was Dr. Gornet reviewed the medical records, and my mistake was Mr. Sykes had seen Dr. Helen Blake for some injections prior to being released at MMI, not Dr. Gornet. So I do apologize for misspeaking to the court. What was the name of the injection person? Dr. Helen Blake. The injection was performed January 14, 2015. The injection was a left S1 joint injection with fluoroscopy. And the date on that was? It was January 14, 2015. Okay. Your opposing counsel, though, indicated that he didn't have any problems between January 26th, I'm sorry, that he started to complain of back pain January 26th through February 2nd. Is that what the record would reveal? Well, I would say that if you examine the records, the very detailed records of his physical therapist, found in Dr. Evanston's notes, you would find that his symptoms, as expected from someone of his condition, of his sort of medical history, seemingly wax and wane. He has good days, he has bad days. That's a reality. That's a medical reality. However, in determining whether or not, to be very candid, Your Honors, the determination of whether or not he was at maximum medical improvement is not a distinction that is really at issue, because at the time, the call, it was the right call. And the doctors were charged with a primary objective, and that was to return Mr. Sykes to a level in which his symptoms would be effectively managed, and so he could return to work. And Mr. Sykes stipulates that the injury that he was off immediately prior to his February work injury was not work related. Well, it's not. It was not prior to that. It was not work related. So February 6th, he had an accident, and to use workers' compensation parlance, that arose out of reinforcing his employment. Now, I think it's important to note that when examining whether a line-of-duty pension is appropriate, a lot of the same elements, a lot of the same factors in determining a line-of-duty pension are used in workers' compensation. Now, we look at the statute. The statute says if the injury is in the line of duty, it's compensable, or if it's the cumulative effects. Now, I believe that the cumulative effects is a very important and critical element here, not only because it's the primary basis of our case here, but because it speaks to a similar reality that is also addressed in a lot of workers' compensation. Your Honor, if it's a medical reality, if we take a cross-section, if we take CT scans, MRIs of everyone in this room, we will find degenerative changes among all of us. The question becomes, are those changes the cause and or source of disability or pain? Are they symptomatic, to get down to the patient's level? Well, we know that degeneration can become symptomatic over a period of time, and we know that degeneration can become symptomatic as a result of trauma. What we also know is that Mr. Sykes had two work-related accidents. They are described in my brief. As a result of the accidents, there is some discussion regarding whether or not the 2007 work accident, or the 2007 surgery was necessitated by his work accident when he was prying open the car, the hood of the car while it was on fire. And I believe a thorough review of Dr. Kennedy's notes, who was his back doctor at the time, will fully explain the physiology involved. Now, part of what we've discussed, and I believe if you'll allow and indulge me, allow me to expand the analysis just slightly. Now, counsel spoke of two prior work accidents and two other incidents that were not work-related. And I believe the discussion moved toward whether or not the court is being called to parse them out. I humbly submit to you that a similar discussion was addressed in an Illinois workers' compensation case. Andy Smith v. National Crate, where the court found that in order for the nexus to be broken, in order for the causal chain to be broken, we must have a physiological or symptomatic change. It's got to be something different. Now, all the doctors agree, as far as the physiological findings here, Mr. Sykes has degenerative dysplasia. That's the physiological reality. All the doctors agree that he can no longer serve his community as a firefighter. What seems to be the point of the part is whether or not his disability is due to the chemical effects of the job, or whether or not it's due to that particular incident. I think all four doctors would recognize that that aggravation would not render him completely invulnerable to safety, regardless of whether or not it's a convincible workers' compensation claim. If we're going to address this under the guise of whether it's a pension disability, or a line-of-duty pension disability, as appropriate, we must examine, the analysis must go a step farther, and look at his entire medical history. The surgery that Mr. Sykes had, namely effusion, if I remember correctly, will place additional strain on the adjacent levels. Some doctors coin this as an adjacent dis-disease. He had effusion? I believe so, Your Honor. Allow me to double-check it. Yeah. Is that correct? Page 6. Thank you. Right. Effusion at L4 and at L5, specifically. Now... Did Dr. Gournett testify about the effects that would happen with the neighboring vertebrae and discs, like you're talking about? Whether there's this eventual failure? Admittedly, Your Honor, I don't have an independent recollection of whether or not he addressed that point specifically during his deposition or during his testimony regarding this case. Okay, but that's what you were going to discuss. Oh, you were discussing. I am discussing, as a matter of... Is that in the record? Well, Your Honor, if I may, and I apologize if I overstepped the mark, regardless of whether it's in the record or not, matters of medical fact are... Although I understand it helps to be on the record, but matters of medical fact are such that Your Honor could probably take judicial notice of that. However, even if we discount that element, even if we remove the adjacent disc disease and the effects of the lumbar fusion on Mr. Sykes' disability, what we know is he has degenerative disc disease, and at one point he had two injuries, two work-related injuries, that ultimately further deteriorated the condition of his back. It further compromised the integrity, the structural integrity, the symptomatic manifestation. And what we don't have, we don't have a single subsequent injury, accident, work-related or otherwise, that would break the causal chain such that we have different pathology, different symptomatic manifestation, or anything of the like. Consequently, the evidence, I believe, is quite clear. In fact, one of the IAEA doctors for the board stated that if Mr. Sykes was not a pacifier, this really wouldn't be an issue. This is an aggravation. Now, a lot of discussion has been made. We've had a long discussion about his issue, but let's also talk about what he was doing when he was injured and the issue of credibility. Now, counsel is 100 percent right. The circuit court is not in a position to re-weigh the evidence, especially matters of credibility. That's by design, and I think that is obvious and goes without saying. However, when we address credibility, we don't completely discount it. Indeference isn't completely exclusive. Credibility also adds to what is clearly apparent, specifically when we address it through the standard in which we're called to review this, to manifest the evidence. During the hearing before the board, there was no follow-up witness. In fact, one of the members of the board was present when, during one of Mr. Sykes' workings or his prior workings. His credibility was not, I mean, was not rebutted. It was not called into question. Contrary evidence was never presented. Now, whether or not we weigh this differently is different than whether or not we consider this at all. I believe that that's what the circuit court judge did in this case. He didn't apply different weights. He just considered the evidence before. And the totality of the evidence is medical history, is testimony. The medical conclusions led him to believe that an opposite conclusion was clearly apparent. Now, was Dr. Cornett hired as an expert or was he a treater? I believe at this point, Your Honor, he's a treating physician. But Dr. Cornett has a sterling reputation. He's among the leaders in his field. And I submit to this court that the opinions of the doctors are not as different as we are allegedly.  And, in fact, the differences I've discussed in my briefing, and admittedly it's difficult to find a difference outside of the ultimate determination because objectively when we address the facts that they've taken into consideration, they're all looking at the same facts with the exception of a few looking at fewer facts than some. We know that he's disabled. There's no dispute. But I find it extremely, I believe the transcript, specifically the end of the transcript, illustrated a point, an overarching point here that I think is fairly obvious. The question was asked to Mr. Sykes and his attorney whether or not he filed for a pension or non-life-imprisonment. And he was suggested to do so. This is a simple, I believe it speaks to the intention of the board to do the right thing, but I believe they missed the mark when it comes to what the statute calls for in this case. That's plenty. Mr. Sykes argues that the decision of the board was indeed and in fact against the manifest way of the evidence and that the circuit court appropriately made their finding. Any questions? No. Thank you very much, Mr. Patti. Thank you. I appreciate it. And, again, I apologize for the interruption. Not at all. I try not to do that. Is there some rebuttal? Okay. Counsel used the phrase that this case, the way this case arose, might raise some eyebrows. And I think that's exactly where we are in this case. Dr. Gournett, in the reference I found, said that there's no evidence that Mr. Sykes was severely symptomatic prior to February of 2016. But you compare that to the chiropractor's notes, and the chiropractor says that even in January of 2016, that Sykes' back pain is aggravated by all movement, especially left lateral bending. Mr. Sykes had 77 visits with the chiropractor or the physical therapist between 2014 and 2015. And by my count, in 74 of those, he described symptoms of back pain. But even with that finding on January 26th, that his back pain was aggravated by all movement, especially left lateral bending, the chiropractor, a week later, clears him for work with no restrictions. And he's injured on the first day. He claims an injury on the first day. Was it witnessed? There was no testimony from anybody except Mr. Sykes about what happened on February 6th. Nobody else called to talk about what they saw? Nobody. The court found, in paragraph 6 of its order, upon reviewing the medical records of Dr. Kibbe, Dr. Homan, Dr. Malik, and Dr. Gornett, this court finds petitioner incurred injuries in the line of duty, etc. Entitled into a line of duty disability. Dr. Malik, Board Exhibit 2, page 17 and 18 of my brief, Dr. Malik says, It's my professional medical opinion that Mr. Sykes' chronic symptoms and radicular pain is predominantly caused by his significant non-occupational pre-existing lumbar degenerative disc disease. What more competent evidence can the board rely on than language like that? And as noted, the MRIs pre-2014 and then post-injury in 2015 show no significant changes. The board came to the conclusion, supported by Dr. Malik and others, that the cause of the disability in Mr. Sykes is the pre-existing non-occupational lumbar degenerative disc disease and the incident of February 6th is not the cause or an aggravation resulting in his duty disability. He shouldn't have done that. But he was, and he did reflect on the questions afterwards. Do you have any further questions? No questions. You're welcome. Okay, thank you so much. Thank you. Appreciate it. At this time, there's no further cases set for oral argument this morning, so the court will be in recess. We will take your case under advisement and issue an order in due course. We'll be in recess until 1 o'clock. Actually, there is no afternoon docket. Nope. The court is in recess until tomorrow. Thank you.